**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GREGG GARNER,**<br>Plaintiff,<br><br>v.<br><br>**GODLY RESPONSE TO ABUSE IN THE CHRISTIAN ENVIRONMENT, INC., d/b/a GRACE,**<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **JURY DEMAND** |

**COMPLAINT**

## I. NATURE OF THE ACTION

1. GRACE supplied purportedly independent expertise to institutional leaders who were already accusing Gregg Garner of sexual abuse, helped those leaders characterize consensual adult relationships as criminal clergy sexual abuse, taught school families and the church community to recognize sexual grooming and offender behavior, and then distributed its own questionnaire identifying Garner by name within those categories. The published materials drew upon academic child-sexual-grooming terminology, reached parents and students, and referred to "known survivors" before GRACE made final findings. GRACE neither interviewed Garner nor requested his account before publishing those false and defamatory materials.

2. The defamatory sting was specific and devastating. GRACE did more than suggest that Garner had violated an ethical boundary in adult relationships: its combined statements and imagery portrayed him as sexual abuser and a "groomer"—a deceptive sexual predator whose conduct implicated the safety of children—and treated the existence of "survivors" as established. That accusation was false. The Defendant was aware that no child was involved in Garner's adult relationships, and he never engaged in sexual grooming, sexually inappropriate conduct, or sexual

abuse involving a child. The false implication reached families of the schools he founded, former and current ministry participants, and people whose trust was essential to his livelihood. GRACE expressly encouraged further circulation.

3. GRACE gave disputed and questionable accusations additional credibility, broadened their audience, and made them harder to dislodge. Its publications damaged Garner's reputation, deprived him of professional opportunities, aggravated disabling emotional injury, and contributed to the international escalation described below. This action seeks compensation for that added injury and the statutory and punitive remedies warranted by GRACE's conduct.

## II. PARTIES, JURISDICTION, AND VENUE

4. Plaintiff Gregg Garner is citizen and resident of Davidson County, Tennessee.

5. Defendant Godly Response to Abuse in the Christian Environment, Inc., doing business as GRACE, is a Florida nonprofit corporation. On information and belief, its principal place of business is Lynchburg, Virginia, where its officers direct, control, and coordinate its activities. Its corporate filing identifies Lynchburg as its principal address and lists its chief operating officer there. GRACE is a citizen of Florida and Virginia.

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The parties are completely diverse. The amount in controversy exceeds $75,000, exclusive of interest and costs, based on Garner's personal economic losses, impairment of earning capacity, and other compensable injuries.

7. GRACE purposefully provided professional services to Tennessee institutions and their Tennessee-centered community. It consulted with institutional leaders, delivered training in this District, and directed its survey and related communications to recipients here. The claims arise from those contacts, and this Court has specific personal jurisdiction over GRACE.

8. Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to this action occurred in this District, including the consultations, community training, survey distribution, and receipt of the challenged communications.

9. Mike Sloan conducted consultations and training for GRACE. Emily Petrie served as its lead investigator, and Daniel Barroga transmitted its survey and reminder from his GRACE email address. On information and belief, each acted within the scope of employment or agency in carrying out GRACE's engagement. The challenged consultation, instruction, survey, and distribution were GRACE's own professional services, delivered through those agents.

## III. STATEMENT OF FACTS

### A. Garner's work and the allegations GRACE was retained to assess

10. Garner founded Global Outreach Developments International (Global), The Church Community for GOD (the Church), The Institute for GOD (the Institute), and The Academy for GOD (the Academy). Over almost thirty years, he built relationships through educational leadership, teaching, consulting, speaking, ministry, and business development. Those relationships supported his professional reputation and ability to earn a living.

11. The underlying September 2025 disclosure concerned consensual personal relationships with adult women who had been Garner's longtime friends, including friendships originating before his clergy role. Garner acknowledges a moral failing, not sexual predation. He did not use force, threats, fraudulent inducement, or a deceptive process to procure sexual contact; he did not engage in nonconsensual sexual abuse or groom any adult or child. The women were adults, not children, during the conduct at issue. No child was involved in that conduct, and Garner never sexually groomed, abused, targeted, or acted inappropriately toward any child.

12. No sexual contact at issue occurred while Garner was providing consultation, examination, ongoing treatment, therapy, or other professional services to treat a mental, emotional, or physical condition. His institutional titles and relationships did not supply those missing facts.

13. The institutions suspended Garner on October 5, 2025, and coerced his resignation on October 8 with false promises that his conduct would be characterized only as a "moral failure." The documented October 15 GRACE consultation occurred just after those events. GRACE then added the authority of an outside specialist to the false abuse narrative, causing further injury and aggravating the damage already underway.

14. GRACE's added authority mattered to school families, ministry participants, business associates, and prospective employers deciding whom to believe and whether to associate or work with Garner. Recipients treated the outside organization's expertise as a reason to accept the abuse classification and act on it. Its consultation, instruction, and named survey caused reputational exclusion and lost relationships before any final report.

### B. GRACE supplied the criminal abuse characterization before assessing Garner's account

15. At the October 15, 2025 Church board meeting, Kristin Bennecker reported that she, Adam Loeffler, and Grant Dailey had met with GRACE's Mike Sloan that morning. She recounted his advice about adult clergy sexual abuse, the need to educate the community, and Tennessee criminal law.

16. Bennecker read a definition describing adult clergy sexual abuse as exploitation of a power imbalance by a religious leader to engage in sexual behavior with an adult congregant, with meaningful consent absent because of that inherent power difference. She told the board, "That is what we are dealing with."

17. Bennecker attributed to Sloan a distinction between an affair with a preexisting friend outside a ministry relationship and sexual conduct within a leader's sphere of authority. Her account nevertheless treated the latter as never consensual and "literally criminalized in our state." She described his advice as requiring the community to understand the events through that abuse framework. The distinction mattered because Garner's adult relationships involved longstanding personal friendships; clergy status did not, by itself, establish either deceptive grooming or the elements of a Tennessee sex offense.

18. Tenn. Code Ann. § 39-13-505(a) describes specified circumstances for criminal sexual battery, including force or coercion, knowing nonconsent, incapacity, or fraud. Subsection (c)(1)–(2) additionally treats a person as incapable of consent in a limited clergy/professional setting only when sexual contact occurs during specified professional services and the clergy member is treating the person for a mental, emotional, or physical condition. Neither a clergy title nor a supposed ethical power imbalance categorically criminalizes a consensual adult relationship. The categorical criminal rule attributed to Sloan substituted clergy authority for the statute's encounter-specific requirements. Garner's encounters did not involve the services, treatment, coercion, or other criminal circumstances described above.

19. The consultation supplied a criminal-abuse explanation without first hearing from Garner. Bennecker stated that institutional leaders had told Sloan that Garner was describing the adult relationships as affairs within the community. She recounted Sloan's characterization of those disclosures as a "scare tactic" that could deter other women from coming forward. Thus, GRACE knew there was a materially competing account and a dispute over what the relationships actually involved, but instead of obtaining the firsthand participant's version, it gave leaders a categorical abuse framework that would allow his denial to be characterized as additional offender

behavior. Bennecker described the goal of community education as having people accept that framework: "People need to get there eventually."

20. At the October 21 joint board meeting, Dailey and Loeffler described an initial GRACE call, a follow-up email, and a further call. Dailey stated that Sloan had supplied the Tennessee criminal statute and told them adult clergy sexual abuse was a crime. Loeffler reported that Sloan took their account to GRACE's team, whose recommendation was strongly to report the matter to law enforcement. He described the team as including former law-enforcement personnel and attorneys and said GRACE would work with law enforcement. The criminal recommendation carried the authority of GRACE's multidisciplinary team.

21. Dailey read the consultant's emailed recommendation to report what they knew to local law enforcement and cooperate in Tennessee. The email advised against informing Garner, his family, or close friends before law enforcement had an opportunity to act. Its stated reasons included the number of reporting persons, Garner's longstanding authority, the possibility of other victims, and prior interactions before some women reached adulthood.

22. Dailey also reported GRACE's statement that it had contacts who could assist internationally and that a person's international location did not prevent tracking that person down. The board discussed criminal consequences and potential imprisonment immediately after describing that advice.

23. Loeffler proposed retaining GRACE before taking the reporting step so that leaders could say, "we hired them. They recommend this." This was not a neutral request for an assessment divorced from institutional interests: the outside engagement was expressly sought to lend GRACE's authority to a criminal escalation and to rubber-stamp an existing interpretation of Garner's conduct from person's with pecuniary motives to have him removed. The institutional

decisionmakers and aligned families involved in the process had personal or financial interests in excluding Garner from enterprises he had founded or owned. Those interests created obvious risks of confirmation bias that a genuinely independent investigator needed to confront rather than adopt. GRACE never did so.

### C. The training was designed to give the community a framework for the named survey

24. At the October 28 joint board meeting, Bennecker explained that GRACE's survey could collect complaints of manipulation and spiritual abuse, including conduct outside sexual relationships, and could show patterns: "they're building a profile for him, essentially."

25. At the same meeting, Bennecker explained that the institutions wanted GRACE to teach the community first so recipients would have a framework for answering the survey. Leaders had not yet announced to the community, "this was clergy sexual abuse." However, this was the intended conclusion they needed GRACE to supply.

26. Derek Bargatze proposed telling the community that institutional leaders had supplied GRACE their information and that GRACE considered the matter clergy abuse. He wanted "the power of this third-party external investigation" behind that classification and stated that "the Authority came from them." The leaders were therefore discussing how to use a supposedly independent expert's imprimatur to secure acceptance of a conclusion before the assessment was complete. Several persons promoting that conclusion were business associates or aligned with family members who stood to benefit from Garner's exclusion and the transfer or retention of control over the institutions and affiliated businesses.

27. Loeffler cautioned that declaring adult clergy sexual abuse before the investigation might be irresponsible and described waiting for a report. The discussion recognized both the weight of an outside expert's label and the distinction between an accusation and a completed

assessment. The institutions nevertheless proceeded to present the abuse classification before any report.

28. At the November 2 member meeting, Bennecker explained that leaders had requested the training before the survey because people needed help knowing how to answer. Their goal was therefore to use GRACE to shape a narrative rather than investigate facts. The institutions, nonetheless presented GRACE as an independent group of multidisciplinary experts who would perform the investigation and supply the labeling.

29. When a member in front of a large audience asked whether high-school Academy students should be questioned about interactions with Garner, Bennecker deferred to GRACE. She stated that GRACE had been told the engagement involved a K–12 school, a college, a church, and a nonprofit, and explained that "they know that we have a lot of people potentially harmed in this moment." GRACE knew the setting included children and school families. Bennecker invoked its knowledge to suggest potential harm to that audience before the survey and interviews. GRACE knew or should have known there was no evidence at all supporting a claim that Garner had ever harmed a child, let alone a student at the school.

30. On November 5, Laurie Kagay informed Institute parents that the GRACE process would include abuse education, a confidential survey to all students, and selected interviews. She acknowledged that many newer students did not know Garner. All students were nevertheless invited to the educational component and could fill out the surveys of and concerning Garner.

31. A November 7 Church email announced GRACE's November 9 session from 1:00 to 5:00 p.m., with three hours of education followed by an hour concerning the investigative process and questions. Organizational members, Church attendees, Institute students, and Academy parents were invited, and a recording was promised for those unable to attend.

32. A contemporaneous Academy notice identified the allegations as involving adult women and stated they were not connected to students at either school. The training and survey nevertheless addressed children, youth-serving institutions, and potential child-protection concerns in the setting of the investigation of Garner. Thus, the false implication that Gregg Garner had harmed children or posed a threat to them was still presented and this narrative was continued.

33. On November 9, Sloan delivered GRACE's training to that community. He addressed abuse, trauma, sexual grooming, offender tactics, and DARVO (deny, attack, reverse victim and offender). Recipients attended because their institutions had announced an investigation concerning Garner and told them the training would prepare them for the upcoming survey to report abuse by Garner.

34. Sloan defined sexual grooming as a deceptive process designed to facilitate sexual contact while avoiding detection. The behaviors described included gaining access, isolation, trust-building, desensitization, and preventing disclosure, and he expressly extended the rubric to children and adults. In the same training, GRACE characterized ordinary acts of attention, care, religious mentoring, and increasing intimacy as conduct that could evidence grooming when retrospectively interpreted through its expansive power-imbalance framework. GRACE did not furnish listeners a reliable factual distinction between deceptive sexual targeting of a child and consensual adult relationships with longstanding friends. The failure to make that factual distinction was, at a minimum, negligent.

35. Sloan described denial, attacks on a reporting person or process, and efforts to reverse victim and offender as tactics that could interrupt accountability. He taught that leaders should follow through when allegations were met with DARVO. In this setting, the instruction gave the community a framework for interpreting Garner's denial of the accusations as evidence

of "offender behavior," rather than as an alternative account requiring independent investigation and evaluation.

36. At the November 23 member meeting, Bennecker reported that she had met with GRACE the preceding week and told it the training provided a helpful backdrop, shared language, and understanding before surveys or interviews. She also stated that GRACE was creating a survey specific to the institutions and was considering making training the first step in every engagement. GRACE thus received direct feedback about how its instruction was shaping this community's inquiry about Garner before developing and delivering the named survey.

37. GRACE delivered the November 9 training before the institutions signed the formal investigation agreement. At the November 16 member meeting, Parker stated that no contract had yet been signed. On November 23, Bennecker announced that the parties had signed the preceding week for a discounted $52,000. Institutional representatives would work with GRACE and supply contact information for church members and participants abroad. GRACE's December 11 billing email identified invoices for $15,000 and $4,672.24. The fee was paid by institutions whose leadership had already sought GRACE's authority for an abuse finding. Payment did not itself establish bad faith, but the client's influence over the engagement, witness access, institutional narrative, and future professional relationship created a financial and structural incentive to validate the commissioning leadership's account rather than independently test it.

38. On November 24, GRACE supplied Bennecker with a link to the training recording for distribution to the intended audience. The instruction remained available to recipients who had missed the session and to those who wanted to view it again.

**D. GRACE circulated the named survey and expressly invited further sharing**

39. On December 14, the Academy announced GRACE's independent investigation following "credible allegations of sexual misconduct involving adult women" against Garner. It described GRACE's multidisciplinary expertise and stated that parent contact information for every currently enrolled student had been supplied to GRACE for the initial survey.

40. On December 16, 2025, Barroga sent GRACE's survey invitation from his GRACE email address. It identified the Church, Global, the Institute, and the Academy as the institutions under review, described an objective and independent investigation, and identified Petrie as the lead investigator. Interviews were to follow the survey.

41. GRACE expressly invited wider circulation: "If you know of others who may have information related to this survey, you are welcome to share the survey link with them." The survey's audience, and the defamatory implications within the survey about Garner, therefore extended beyond the contact lists supplied by the institutions.

42. A December 19 Institute email announced the independent GRACE investigation following "credible allegations of sexual misconduct" against Garner and identified Petrie as the lead investigator. Institute families also received the survey. The earlier notice had already promised the survey to all students.

43. On February 3, 2026, Barroga sent a further invitation to access the same survey and complete it by February 17. This was a new direct communication by GRACE promoting the named survey to recipients.

44. GRACE's distribution reached organizational members, church attendees, school families, college students and their families, ministry contacts, and current and former community participants, including people whose involvement ended years earlier. Based on Garner's knowledge of those communities and the distribution, the intended audience potentially exceeded

1,000 persons. Forwarding permitted the survey to reach an even wider audience, and Plaintiff avers upon information and belief that the audience was now thousands of individuals.

45. Despite the prior coordination between GRACE and leadership, the survey introduced GRACE as an "independent investigator" with an unbiased approach and multidisciplinary expertise, including prosecution, law enforcement, and mental-health experience. It targeted Garner as the person whose alleged misconduct GRACE would assess. It was not neutral. He was the only individual named as an alleged perpetrator. That presentation gave the accompanying abuse framework the authority of an independent professional assessment.

46. GRACE's stated scope included physical sexual misconduct, sexual misconduct through verbal or virtual communications, adult clergy sexual abuse, grooming, abuse of pastoral or spiritual power, "financial misconduct," and emotional or psychological abuse. The survey placed Garner within that collection of abuse categories, falsely implying he was already guilty.

47. GRACE defined adult clergy sexual abuse to include any sexual behavior within a clergy-congregant relationship, with meaningful consent absent because of the inherent power difference. That definition repeated the power-based rule supplied during the consultations. Combined with Sloan's categorical criminal explanation, it presented Garner's consensual adult relationships as criminal sexual abuse because he was a leader. Yet, GRACE knew or in the exercise of reasonable care should have known that the service and treatment requirements in Tenn. Code Ann. § 39-13-505(c)(1)–(2) were absent.

48. The survey defined "sexual grooming" as a deceptive process designed to facilitate sexual contact while avoiding detection and described, among other things, developing trust with guardians, the community, and youth-serving institutions. GRACE cited WINTER, KAYLOR, AND JEGLIC, "Toward a Universal Definition of Child Sexual Grooming," a work expressly identified

as addressing *child* sexual grooming. GRACE knowingly borrowed a term and cited authority with an unmistakable child-sexual-predation association, extended its application to adult clergy relationships without clarifying the distinction, and then placed that term alongside Garner's name in a survey circulated to parents and students. GRACE never distinguished an allegation about consensual adult relationships from any allegation involving children.

49. The central named question asked: "During your time at CC4GOD, GOD Int'l, the Institute, the Academy, or at a different time, have you experienced any form of sexual misconduct, grooming behavior, and/or abuse of pastoral or spiritual power by Gregg Garner? (Please refer to the definitions provided here)."

50. GRACE offered only a single Yes or No answer to the entire named question. A complaint only about spiritual-power abuse produced the same unqualified Yes beside Garner's name as a report of sexual abuse or deceptive sexual grooming. That combined answer did not identify which category applied or whether sexual conduct had occurred. Later description fields invited narrative detail, but the named binary question itself joined those different accusations and reinforced the abuse portrayal GRACE had already supplied. By employing this multi-barreled questioning technique, GRACE knowingly, recklessly, or at a minimum negligently conflated materially different categories of alleged misconduct into indistinguishable affirmative responses, creating a misleading composite measure that could falsely inflate the apparent prevalence of sexual abuse or grooming allegations against Garner while concealing that some respondents may have reported only nonsexual grievances or a subjective belief that they were under-paid.

51. Another question asked whether the respondent knew of someone else who had experienced sexual misconduct, grooming, pastoral or spiritual-power abuse, or "financial

misconduct" by Garner. It invited secondhand reports within the same framework. Repetition by several respondents could describe the same alleged event rather than separate victims or events.

52. The survey then asked about leadership's treatment of "known survivors" of sexual misconduct, grooming, and abuse of spiritual power, inviting respondents to choose descriptions including supportive, indifferent, and blaming responses. "Known survivors" is not synonymous with "persons making allegations." In ordinary usage, a survivor necessarily survived an actual wrong; in this named investigation, using that expression presupposed the existence of victims and, by implication, a perpetrator. Garner was the only individually named accused person in the survey. The question therefore supplied a false and defamatory presupposition that abuse had already been established, while providing no completed investigative finding or identified misconduct supporting it.

53. GRACE sent the named survey to school families, allowed respondents to identify as seventeen or younger, and included Academy students and parents in its choices. It simultaneously asked about recognizing and reporting child abuse and adequate child-protection practices. That child-focused framing was part of the very publication naming Garner within the sexual-grooming inquiry. A reasonable parent or student exposed to the integrated message could understand it as implying that Garner had sexually groomed children or was a sexual danger to them. No alleged misconduct involving a child furnished a factual basis for that implication; indeed, contemporaneous institutional notices acknowledged that the accusations concerned adult women and were not connected to students at either school.

54. Recipients were exposed to a coordinated sequence: GRACE used its reputation and/or authority to launder mere one-sided allegations as credible findings; GRACE supplied a categorical clergy-abuse and criminal-law explanation; GRACE trained the community in child-

and adult-sexual-grooming concepts, offender tactics, and DARVO in the context of Garner being the sole suspect; and GRACE then named Garner in combined sexual-abuse and grooming questions while referring to "known survivors" and child safety. The message was not merely that untested allegations existed. Read as a whole, it presented independent experts as having validated an identity—sexual abuser, groomer, and potential danger to children—before a completed assessment. The survey's answer boxes and promise of interviews did not erase the implication produced by that sequencing and GRACE's claimed authority. These acts and omissions were, at a minimum, negligent.

55. GRACE promised confidentiality for completed responses. The invitation, named questions, definitions, and abuse framework were visible to recipients and anyone receiving the shared link. That distributed text itself communicated the damaging portrayal, independently of completed responses or final findings.

**E. The false portrayal and GRACE's knowledge**

56. GRACE's written presentations and case-directed communications conveyed at least three distinct materially false and defamatory factual implications: (a) Garner committed criminal or otherwise nonconsensual sexual abuse against adults; (b) Garner employed deliberate sexual grooming, deception, and manipulation to obtain sexual contact rather than engaging in consensual adult relationships; and, most seriously, (c) Garner was a sexual groomer of children or posed a sexual danger to children at the Academy and within the community. The third accusation carried the most destructive defamatory sting because "groomer," coupled with child-focused training and survey questions, naturally evokes an adult deliberately preparing or targeting children for sexual exploitation. GRACE had no factual basis for imputing that conduct or danger to Garner.

57. The relevant relationships were between adults, including longstanding family friends, and involved no sexual contact with, predatory targeting of, or inappropriate conduct toward any child. Garner had not used a deceptive process to procure sexual contact with anyone. The relationships did not involve professional treatment or consultation satisfying the distinct circumstances in § 39-13-505(c), nor did they involve the specified criminal circumstances in subsection (a). Even if the conduct offended religious expectations, the truth about consensual adult relationships was substantially different from the false accusation that Garner was a criminal sexual abuser or a child-sexual groomer. That difference was the substance, not a minor detail, of the injury to his reputation.

58. On March 12, 2026, The Tennessean reported MNPD's statement: "We did not find any criminal conduct based on reports made by two women last year." The newspaper also reported that MNPD had no ongoing criminal investigation involving Garner or Global, and its March 25 report repeated that assessment. The police assessment did not create the earlier falsity; the statutory and encounter facts rendered GRACE's categorical criminal characterization false when made. MNPD's later conclusion provided powerful, independent contrary information and a reason for GRACE to reassess any continued assertion of criminal abuse. Unlike GRACE, a public law-enforcement agency did not depend on a fee from institutional officials seeking to exclude Garner and motivated to harm his reputation. On information and belief, GRACE did not issue a correction or retract its characterization after this contrary assessment became public, and the extent of any affirmative post-March dissemination or renewal of the challenged statements is within GRACE's communications records and will be established in discovery.

59. GRACE never interviewed Garner, sought a written response, or requested his account during the consultations, training, December survey distribution, or February reminder. It

relied instead on accounts channeled through institutional leaders, including Rosemary Sherrod, who, on information and belief, lacked firsthand knowledge of the sexual encounters and had close personal or familial interests aligned with persons seeking Garner's removal. GRACE bypassed the witness most directly able to address consent, longstanding friendships, lack of child involvement, and the absence of professional-treatment circumstances. Hannah, Garner's principal contact at Red Banyan, advised him that her firm had previously worked with GRACE and understood that GRACE ordinarily interviewed accused persons; the firm was surprised that it did not do so here. GRACE's self-described commitment to objectivity did not produce even the elementary safeguard of obtaining the accused person's account.

60. GRACE knew that its credibility assessment remained incomplete and that its promised interviews would follow the survey. It trained the community before the signed engagement and received direct feedback that the training had supplied institutional leaders with the desired vocabulary and framework for characterizing Garner. Despite that feedback and the commissioning leadership's demonstrable interest in an abuse conclusion, GRACE accepted the paid engagement, created the named survey, combined sexual and nonsexual allegations to be answered only by Yes or No, and circulated that product widely. Those circumstances furnished specific reasons to inquire whether the allegations had been shaped by conflicts of interest before adopting their defamatory factual implications.

61. On information and belief, GRACE authorized, approved, and supervised the consultations, November training, survey design, and distributions through Sloan, Petrie, Barroga, and its investigative team. GRACE presented its staff as a multidisciplinary team, including legal and law-enforcement experience; however, the official responsible for the challenged training and criminal-law explanation, Sloan, has a theological and pastoral background. The existence of

professional credentials does not excuse a one-sided investigation or a failure to check the governing statute and seek the firsthand account of the accused. GRACE's agents applied a purported criminal-law classification without obtaining Garner's account, testing materially conflicting sources, or establishing the statute's elements. Its management knew the assessment remained unfinished yet approved a publication likely to be understood as an expert finding of guilt.

62. On information and belief, GRACE intended recipients to apply the instructional framework to Garner and endorsed the impression that independent professionals had validated the charges. GRACE knew that the commissioning leadership sought the authority of its name; the board discussions expressly described the value of being able to say GRACE "recommend[ed] this," and of locating the "Authority" in GRACE. GRACE then accepted approximately $52,000 for a process in which the commissioning entities controlled much of the initial information and distribution. GRACE knew or should have known that the same institutional figures and persons aligned with Garner's business ventures had pecuniary or governance incentives to remove Garner and preserve or assume control of affiliated organizations and businesses. The paid relationship, feedback about how its training had advanced the chosen narrative, and GRACE's continued promotion of its named survey demonstrate that GRACE prioritized the institutional clients' desired validation over a genuinely independent assessment.

63. On information and belief, GRACE subjectively entertained serious doubts about the material factual accusations it was conveying and purposefully avoided readily available contrary facts. It knew Garner described the events as adult affairs; knew institutional actors wanted an external endorsement of their preselected clergy-abuse narrative; supplied the narrower Tennessee sexual-battery statute; knew its child-grooming source described child sexual

grooming; and knew it had not interviewed the principal firsthand participant. The subsequent Jane Does pleading reinforced reasons for doubt: it obscured that the persons involved were adults, including women in their late thirties or forties during relevant events, and presented extraordinary claims of thousands of hours of uncompensated massages and allegations characterizing affairs as trafficking or forced labor/slavery that warranted basic verification. These were mere allegations made by others, not facts GRACE was entitled to accept without inquiry. Coupled with financially interested institutional sources, the use of non-firsthand accounts, the conflation of ethical misconduct with crime, and MNPD's later public finding of no criminal conduct, the failure to ask obvious questions supports an inference of purposeful avoidance and subjective reckless disregard, in addition to negligence.

64. The challenged meanings concern objectively verifiable matters: whether a child was ever targeted or harmed; the adults' ages and longstanding relationships; whether Garner deceptively procured sexual contact; whether any contact was nonconsensual; and whether any statutory condition for criminal sexual battery existed. No judicial resolution of religious doctrine is required. GRACE was free to discuss theological standards and possible misconduct. Instead, it replaced facts with labels carrying the materially different criminal and child-sexual-predation meanings alleged here.

### F. Recipients adopted the portrayal and carried it into personal and commercial relationships

65. The adult women whose personal relationships were at issue had been Garner's close friends. They understood those relationships to be consensual and described them that way to others. After GRACE supplied its abuse framework, they recast those relationships as victimization and themselves as victims and survivors. GRACE's claimed expertise gave that

changed account professional validation and supplied a new identity for the same adult relationships.

66. At the November 16 Church meeting, one week after GRACE's training, Laurie Kagay adopted GRACE's language of "survivors" and presented the adult women as victims and heroes before hundreds of community members. She announced victimization as settled while GRACE's independent assessment remained ahead. The consensual adult relationships did not establish the nonconsensual abuse or deceptive grooming that this victim-and-abuser account conveyed. GRACE's advice and conditioning event gave that account professional authority and emboldened its public presentation.

67. At the November 23 member meeting, Matthew Parker explicitly applied what "the GRACE people" called DARVO to Garner's communications, describing deflection through which the offender becomes the victim. The training's framework was thus used to discredit Garner's contrary account as further evidence of offender behavior.

68. After the GRACE training, Kim Ownby accused Garner of attempting to groom her fifteen-year-old daughter. That accusation was false. A forty-two-year-old woman who was very close friends with Garner, and other adult women, spontaneously described him as having groomed them because of what they learned at the training. Garner had not engaged in deceptive sexual grooming of those persons or any others.

69. Garner learned that community member Simon Liley told others that at least fifteen women had come forward saying they had been groomed or sexually abused. That account was false. The assertion demonstrates the expanded victim narrative circulating in the community as a direct result of GRACE's training and its misleading survey process.

70. On January 8, 2026, Matt James sent Garner's son a message calling Garner a "grooming, predatorial, sexual abuser" and declaring the conduct legally sexual abuse. James predicted that the forthcoming GRACE investigation report would expose Garner's alleged sexual deviancy. In the same message he described Garner's ownership of their businesses as "not for long." James's simultaneous prediction of GRACE's findings and Garner's impending loss of business interests supports the inference that James had prejudged the investigation's outcome and had a pecuniary motive for ensuring that GRACE validated the accusations against Garner.

71. On December 31, 2025, Genovations Realty partner Jared Benoit stated in a business meeting that Garner's clergy role made the adult conduct a violation of Tennessee law. He described breaking communications with Garner and moving toward business separation and rebranding. The criminal-abuse classification supplied by GRACE had therefore been used by others to justify decisions to shut Garner out of several businesses and the personal income they had supplied.

72. Garner was a co-owner or sole owner of MCH, HFC, NOVA, NFS, MCL, and Genovations Realty. Partners, managers, and employees invoked the "credible allegations," their criminal sexual implications, and the announced investigation to justify ending their association with him or severely restricting his participation. Those decisions were communicated to Garner directly and through business-partner counsel. GRACE's terminology and claimed independent validation made the accusations appear professionally established and gave those business decisions a legitimizing rationale. The resulting exclusion disrupted his businesses and deprived him of personal compensation and opportunities to provide paid work.

73. Between August and October 2026, at least three substantial prospective professional engagements progressed to interest or work and then ended because of the allegations.

Garner estimates the resulting lost personal professional income at $350,000. The continuing abuse portrayal obstructed replacement work beyond the original institutional removal. GRACE added the professional authority and persistence that sustained that portrayal.

74. GRACE invited wider sharing of the named survey in a community whose families, ministry participants, and business associates overlapped. Their repetition of its abuse and grooming classification was a foreseeable result. The recipient statements above show that its professional authority furnished a basis for treating and repeating the portrayal as fact.

## G. Garner's personal injuries and losses

75. GRACE's publications caused further loss of personally earned compensation, impaired Garner's ability to obtain paid teaching, speaking, consulting, and leadership work, and diminished his future earning capacity. His personal losses include denied compensation and paid engagements, impaired earning capacity, reasonable treatment expenses, and consequential personal expenses. His earning history included approximately $1.77 million in wages from Global and the Church during 2020–2025, together with separate personal business income. That history supplies a basis for evaluating the earning capacity and later opportunities damaged by GRACE.

76. Exposure before the families at his schools, longstanding ministry contacts, and former participants caused severe humiliation, fear, isolation, and loss of security. Garner suffered debilitating anxiety, depressive symptoms, trauma responses, disrupted sleep and eating, and substantial impairment in daily activity and work. GRACE's conduct not only caused these symptoms but prolonged their effects.

77. Garner lost approximately thirty pounds during the course of these events. Anxiety at times confined him to his home for weeks, and he left only when necessary. He required

prescribed medication and ongoing therapy. The distress interfered with working, concentrating, sleeping, eating, and maintaining ordinary social contact.

78. The loss of income and expenses incurred during the broader course of events increased Garner's personal debt by more than $700,000. He incurred treatment and other reasonable personal expenses in responding to the injury and accusations.

79. The consequences reached Garner's ministry in Uganda. GRACE's criminal classification, police-report recommendation, international-contact advice, and apparent independent validation emboldened Global's later reporting and pursuit. Subsequent reports invoked the announced investigation to legitimize the allegations, and Ugandan authorities treated later federal civil accusations and the allegations of the "investigation" as established facts. The causal chain ran through that validation, reporting, and reliance by authorities.

80. On September 11, 2026, Ugandan authorities arrested Garner. He spent approximately one week in a rat-infested prison, suffered mistreatment, including several interrogations, torture, food and sleep deprivation, and then remained under travel restrictions and detainment for approximately another week. He was released without charges, and officials told his attorneys that he was "totally innocent."

81. The detention exposed Garner to physical fear, deprivation, abuse, and further trauma. It caused personal expense, interrupted work, and interfered with his business relationships in Uganda and the United States. GRACE's professional validation and advice to pursue criminal and international action materially contributed to that escalation. Criminal action and international pursuit were foreseeable consequences of the response GRACE recommended.

82. GRACE was a factual and proximate cause of additional and aggravated injury after the original institutional action. Its publications reached new recipients, supplied outside

professional authority, and sustained exclusion and denial of later work. That added injury existed before final investigative findings and before the Uganda detention. Recovery also includes any indivisible injury for which GRACE is legally responsible.

83. Garner seeks compensation for his own economic and personal injuries caused by GRACE. The compensatory demand is one aggregate recovery. Each loss will be compensated once, accounting for overlapping compensation obtained in another action. Statutory enhancement and punitive relief are sought as provided below.

## CAUSES OF ACTION

### COUNT I
### DEFAMATION INCLUDING DEFAMATION BY IMPLICATION

84. Garner incorporates paragraphs 1 through 83. GRACE, through Barroga, published its own written invitation and linked named survey on December 16, 2025, and affirmatively distributed another written invitation promoting the same content on February 3, 2026. It identified Petrie as lead investigator and Garner as the sole named alleged perpetrator and reached Church members, Academy parents and students, Institute students and families, former participants, and others in this District. GRACE expressly invited recipients to forward the publication. Each foreseeable distribution communicated the publication to additional third parties and new audiences.

85. As alleged herein, the actionable defamatory content includes GRACE's combined expert presentation, child-sexual-grooming source, adult-clergy-abuse and criminal framework, named questions, undifferentiated Yes-or-No reporting mechanism, repeated references to "known survivors," and child-safety context, read as an integrated publication following GRACE's community training. In context the publication did not merely report that accusations had been made: it presented Garner as an independently validated sexual abuser and groomer, with false

allegations or suggestions of sexual predation involving children. Such an imputation, directed to school families and a ministry community, concerned Garner's fitness, honesty, safety, and professional standing and was "of and concerning" him because he alone was named as the alleged perpetrator.

86. The most damaging sting was the implication that Garner sexually groomed children or posed a predatory sexual danger to the children within the institutions he founded. GRACE borrowed its definition from a publication explicitly titled "Toward a Universal Definition of Child Sexual Grooming"; knowingly associated the named investigation with guardians, youth-serving institutions, underage survey respondents, Academy students, and child-protection questions; and gave recipients no factual allegation that Garner had acted inappropriately toward a child. "Groomer," as communicated in that context, did not merely convey adultery, romantic relationships with adults, or an ethical boundary violation. It conveyed an identifiable, stigmatizing charge of child-directed sexual predation or danger. That accusation was false in its entirety and had no support in the conduct at issue.

87. All three alleged factual implications were false. The intimate relationships were with consenting adults, including longstanding family friends; Garner used no deceptive sexual-grooming process; no child was sexually targeted, groomed, harmed, or involved; and no statutory circumstances established sexual battery. He had not acted inappropriately toward any child. A moral admission or even a disputed clerical boundary violation did not establish nonconsensual sexual contact, criminal conduct, deceptive grooming, or child danger. The falsely imputed conduct was different in kind and far more damaging than the underlying consensual adult relationships, defeating any contention that the defamatory sting was substantially true.

88. GRACE's framework made any sexual relationship involving clergy authority "abuse" regardless of encounter-specific consent or deception, and its child-grooming definition amplified that classification. The named Yes-or-No question placed sexual grooming beside nonsexual spiritual-power complaints and "financial misconduct"; a Yes to the latter would appear to endorse the former. Particularly important, GRACE repeatedly referred to "known survivors." "Survivor" presupposes that the individual suffered the wrong, and a "known survivor" implies that such wrong was already established. With Garner the sole named accused, that linguistic presupposition constructed a false victim-perpetrator dichotomy before the inquiry was complete. Read with the child-focused passages, it added a specific false suggestion of children being endangered, even though GRACE knew the identified matters concerned adult women.

89. The challenged implications do not depend on a court choosing among competing theological views. They turn on the verifiable existence or absence of child-directed conduct, deception, nonconsent, criminal elements, and an actual evidentiary finding. Statements that omit an expressly defamatory accusation can nevertheless communicate a false defamatory meaning when combined or juxtaposed. GRACE's purported expert labels also carry actionable factual implications rather than being insulated merely by evaluative language.

90. Garner is a private figure as to the controversy and did not voluntarily thrust himself into a public debate over alleged sexual misconduct. GRACE at minimum failed to exercise reasonable care in publishing its defamatory implications. It relied on interested intermediaries with no personal knowledge of the conduct, trained the community to interpret denials as offender tactics, cited a narrower criminal statute while describing a much broader offense, used a definition rooted in child-sexual-grooming research in a survey directed to minors and parents, and failed to interview Garner or otherwise independently examine basic contrary facts, let alone present his

version to any audience. On information and belief, GRACE also failed to supervise and train personnel adequately to distinguish allegations from findings and civil or religious ethical standards from criminal conduct. This negligent-publication theory is pleaded alternatively under Rule 8(d)(2) with the distinct subjective actual-malice allegations below.

91. Separately, GRACE published with constitutional actual malice—knowledge of the falsity of the defamatory factual implications or subjective reckless disregard as to their truth. On information and belief, it seriously doubted the accusations yet purposely avoided inquiry: it had the adult-affair account, knew the sponsoring leaders wanted its imprimatur to label Garner an abuser, knew the statute did not criminalize every clergy-congregant affair, knew its quoted grooming authority concerned children, and knew it lacked firsthand evidence of child-directed misconduct. Despite those warnings, GRACE chose wording that presented "known survivors" and a named "grooming" inquiry as if independently verified, and then invited broad dissemination. This cumulative combination of direct warnings, interested sources, and calculated avoidance supports subjective serious doubts as to the truth or falsity of information, rather than merely a failure to conduct an ideal investigation.

92. On information and belief, GRACE intended, adopted, and endorsed the false implications. Its training was deliberately placed before the named survey; institutional officials expressly told GRACE the training supplied the vocabulary needed to shape the community's responses; and GRACE distributed and renewed the named publication anyway. The commissioning leaders' interest in an abuse finding, the paid arrangement, the conflicting adult-affair account, and available statutory facts provided concrete reasons to question the requested narrative. A factfinder can infer, and Plaintiff therefore avers, that GRACE consciously avoided the obvious sources most likely to contradict it.

93. The December and February writings were GRACE's own publications to third parties, not reports of any judicial finding entitled to any privilege. On information and belief, GRACE also failed to correct its original abuse and grooming characterization after the public March 2026 police assessment contradicted its categorical criminal claim. Garner seeks discovery of any subsequent affirmative transmissions or renewed presentations; for any such publication, GRACE's then-existing knowledge of the MNPD statement and contrary evidence bears directly on fault and GRACE's reckless disregard for the falsity of its publications to others.

94. GRACE's claimed independence gave existing accusations additional credibility, audience, and persistence. Prior institutional action left remaining and future professional relationships capable of further injury. Matt James expressly invoked the forthcoming GRACE report when calling Garner a grooming sexual abuser; Benoit applied GRACE's clergy-based criminal classification to business separation; and counterparties excluded Garner or restricted his paid work. The continuing portrayal also cost the later opportunities in paragraph 73. GRACE's publications and the foreseeable circulation it encouraged were factual and proximate causes of the added injury, independently of a final report or detention.

95. Garner suffered injury to his reputation and professional standing, lost compensation and earning capacity, serious mental injury, and treatment and consequential expenses. GRACE published the defamatory implications with knowledge of their falsity or reckless disregard for the truth. GRACE's managing personnel participated in, authorized, approved, or ratified the challenged conduct with knowledge or conscious or reckless disregard that it would injure Garner. Garner seeks compensatory damages and punitive damages under Tenn. Code Ann. § 29-39-104(a) and (g).

96. In the alternative, GRACE acted negligently in failing to ascertain the truth or falsity of the defamatory implications it published.

**COUNT II**
**FALSE LIGHT INVASION OF PRIVACY**

97. Garner incorporates paragraphs 1 through 83. GRACE gave its framework to the assembled school and ministry community at the November 9 session, then widely circulated the readable portrayal naming Garner across the Church, Global, Academy parents, Institute students and families, ministry contacts, and former participants. It promoted the writings again on February 3 and expressly invited forwarding. The intended audience potentially exceeded 1,000 persons. That community instruction, repeated distribution, and actual adoptions and repetitions in paragraphs 65 through 74 made the false identity broadly known among the people with whom Garner lived and worked.

98. GRACE's expert presentation, the expressly child-sexual-grooming source, the named questions, the presupposition of "known survivors," and the child-focused distribution falsely placed Garner before the public as a sexual predator, including a person who had sexually groomed or endangered children at institutions he founded. It was not merely a statement that adult misconduct allegations warranted investigation. Those implications were false: the relationships concerned consenting adult women, and there was no sexual grooming, abuse, inappropriate touching, or targeting of any child. Presenting a founder of schools as a professionally identified child-sexual groomer to students and parents was highly offensive to a reasonable person.

99. On information and belief, GRACE intended and endorsed that false public identity or, at minimum, subjectively entertained serious doubts as to its truth. GRACE knew the reported relationships involved adult women, cited child-grooming research anyway, accepted the

commissioning leadership's desired framework, failed to ask Garner for his firsthand account, and knowingly combined adult, child, sexual, and nonsexual issues with language implying established victims. The circumstances described in paragraphs 19–20, 23, 36–37, and 47–63, among others, support knowing or reckless disregard, including the institutionally interested sources and GRACE's economic incentive to validate the commissioning leadership. The later MNPD announcement provided further contrary information relevant to any subsequent reaffirmation or publication.

100. GRACE's publications placed Garner in a highly offensive false light by portraying him as a sexual abuser and deceptive groomer who posed a danger to children. GRACE itself generated and amplified the publicity surrounding those accusations, despite knowing that the underlying allegations concerned adult relationships and did not involve sexual misconduct with children. Garner did not voluntarily inject himself into that controversy. GRACE knowingly or recklessly disseminated these false implications without first conducting an adequate investigation or obtaining Garner's account, causing substantial reputational and personal injury.

101. GRACE's broad publicity invaded Garner's personal interest in being free from that false public identity. Its adoption caused severe humiliation, isolation, fear, loss of security, impaired work and daily activity, and treatment expense, alongside the economic consequences in paragraphs 65 through 82. Garner seeks compensatory damages for those injuries and punitive damages under Tenn. Code Ann. § 29-39-104(a) and (g). GRACE authorized, ratified, or approved the reckless course with conscious or reckless disregard of resulting injury through the corporate conduct in paragraphs 20 and 60 through 63.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

102. Garner incorporates paragraphs 1 through 83. GRACE deliberately gave a categorical criminal explanation, recommended police and international action, and instructed his school and ministry community to recognize grooming and offender behavior before its promised assessment. It then circulated and renewed the customized survey placing his name within that framework. GRACE's professional authority turned the false abuse identity into a basis for exclusion and escalation in the relationships sustaining his ordinary life and work.

103. GRACE imposed a purported expert identity of criminal sexual abuser and child-sexual groomer on an identified founder of two schools, trained the parents and ministry community to treat disagreement as offender behavior, and recommended criminal and international escalation before seeking his version or testing elementary contradictory facts. Its DARVO training was then applied to Garner's contrary account. After hearing that institutional leaders had successfully adopted its framework, GRACE used its paid, named survey and the "known survivors" presupposition to deepen that identity. GRACE understood that publicly treating a founder and educator as a sexual threat to children without any child-directed allegation would devastate his reputation and daily life. That cumulative and sustained course of conduct was extreme, outrageous, and intolerable in a civilized community.

104. GRACE consciously disregarded a high probability of serious emotional injury from its targeted course of conduct. It knew Garner's roles in the schools and ministry, the breadth of the selected recipients, and their reliance on its expertise. Bennecker confirmed the effect of the instruction directly to GRACE. Its claimed abuse and trauma expertise made the likely consequences of assigning that false predator identity apparent. It nevertheless carried the

portrayal into the people and relationships sustaining Garner's security and livelihood and renewed its reach.

105. The resulting exposure, exclusion, collapse of professional relationships, and denial of replacement work caused and aggravated disabling distress. Garner lost approximately thirty pounds; anxiety confined him to his home for weeks; sleep, eating, concentration, work, and ordinary social contact were substantially impaired; and he required prescribed medication and ongoing therapy. Those concrete manifestations constitute serious mental injury. The community exposure caused serious injury before final findings or the later detention.

106. GRACE's reporting recommendation and international advice contemplated criminal pursuit of Garner. Its classification and validation emboldened Global's later reporting and pursuit; subsequent reports invoked the investigation; and authorities treated investigation allegations and later federal civil accusations as established facts. The resulting confinement in paragraphs 79 through 81 added physical fear, deprivation, and further trauma. GRACE materially contributed to that escalation and aggravated injury. Its earlier targeted community exposure had already caused serious injury independently of that later official action.

107. The intended false factual implications, subjective serious doubts, and purposeful avoidance in paragraphs 56 through 63 supply constitutional actual malice for the speech within this course. Garner seeks compensatory damages for serious mental and consequential personal injury and punitive damages for the supported reckless conduct under Tenn. Code Ann. § 29-39-104(a) and (g). GRACE authorized, ratified, or approved that course with conscious or reckless disregard of resulting injury through its team response, management-directed services, client feedback, and repeated official delivery in paragraphs 20 and 60 through 63.

**COUNT IV**
**TENNESSEE CONSUMER PROTECTION ACT FALSE BUSINESS DISPARAGEMENT**

108. Garner incorporates paragraphs 1 through 83. This count arises under Tenn. Code Ann. §§ 47-18-104(b)(8) and 47-18-109 for false factual disparagement of his own compensated services and professional business in GRACE's sale and delivery of its investigation services.

109. GRACE offered, sold, and delivered professional investigation, consultation, and training services to Tennessee institutions for an agreed $52,000. It marketed a purportedly independent, multidisciplinary, unbiased inquiry as its product. The November 9 training preceded the signed agreement; GRACE subsequently received direct feedback about how its framework had influenced the community, obtained the engagement, and delivered its customized named survey. The institutional customers sought to purchase the prestige and purported neutrality of GRACE's authority while some decisionmakers had interests adverse to Garner. GRACE had a financial incentive to satisfy those paying customers and validate their desired abuse characterization. The allegedly false factual representations were made as part of the professional product it sold in trade or commerce under Tenn. Code Ann. § 47-18-103(23)–(24).

110. The enumerated unlawful practice was delivery of false or misleading factual representations disparaging Garner's own services and professional business. Barroga sent the GRACE-branded invitation and linked survey to the Tennessee-centered community on December 16, 2025, and issued a new promotion on February 3, 2026. The writings identified Petrie as lead investigator and applied the framework Sloan had supplied. The expert presentation, definitions, named question, combined answer, known-survivor wording, and child-focused content conveyed independently validated nonconsensual abuse and deceptive sexual grooming in Garner's professional relationships. The challenged components appear in paragraphs 45 through 55; the

consent, age, conduct, and treatment facts in paragraphs 11 through 12 and 56 through 57 establish their materially false implications.

111. Garner personally provided compensated teaching, speaking, consulting, educational leadership, and business-development services. Students, families, ministry participants, and professional associates relied on his fitness and trustworthiness in deciding whether to retain, work with, or pay him. GRACE's false predatory and unsafe portrayal attacked the fitness and safety of engaging Garner himself for those services. It thereby disparaged his own professional business through false or misleading representations of fact prohibited by Tenn. Code Ann. § 47-18-104(b)(8).

112. Garner is the person whose services and business were disparaged and who suffered ascertainable monetary loss. Tenn. Code Ann. § 47-18-109(a)(1) authorizes that person to sue for an enumerated unlawful practice. Here, the representations were part of the paid service GRACE marketed, customized, and supplied, and they damaged Garner's own compensated work.

113. The ascertainable loss includes compensation for Garner's own work and denied paid opportunities. His exclusion or severe restriction at MCH, HFC, NOVA, NFS, MCL, and Genovations Realty deprived him of personal income associated with his participation. Decisionmakers invoked credible allegations, criminal implications, and the announced investigation; Benoit applied the clergy-based criminal classification to business separation. At least three prospective professional engagements between August and October 2026 progressed to interest or work and then ended because of the continuing allegations. Garner estimates that additional lost personal professional income at $350,000. Paragraphs 70 through 75 identify the decisions, denied replacement work, and personal earning injury.

114. GRACE's false expert validation furnished counterparties with a professional rationale for excluding Garner and denying paid work. Its directed delivery and invited forwarding placed that rationale among the people whose trust and decisions determined his opportunities and sustained the portrayal while he sought replacement work. The disparagement was a factual and proximate cause of his additional personal economic loss through those private decisions, independently of later governmental action. The statutory damages base is his own ascertainable monetary loss caused by the practice, with each loss compensated once.

115. On information and belief, the deceptive practice was willful or knowing. GRACE was aware of what it had verified and what its categorical presentation communicated. It knew its assessment remained ahead, the supplied statute required narrower encounter circumstances, and the combined Yes could describe no sexual conduct. It received the competing account and feedback confirming the community's use of its framework, then delivered the named portrayal as its expert product. Those objective manifestations support the inference that GRACE was actually aware of the materially misleading presentation under Tenn. Code Ann. § 47-18-103(15). Paragraphs 19 through 20, 36 through 37, and 47 through 63 supply the factual grounds.

116. The intended and endorsed false implications, subjective serious doubts, and purposeful avoidance independently satisfy the constitutional fault required for the publications. The statutory knowing inference concerns GRACE's awareness of the deception in its own presentation. The independently pleaded subjective reckless disregard supplies constitutional actual malice; neither the commercial setting nor the statutory label replaces that higher fault.

117. The expert authority GRACE claimed, nature of the misleading presentation, absence of good faith, directed reach into the relationships controlling Garner's paid work, and resulting personal monetary injury warrant trebling under Tenn. Code Ann. § 47-18-109(a)(3)–

(4). Garner seeks a total of three times the qualifying actual monetary loss and reasonable attorney fees and costs under § 47-18-109(e)(1). Trebling and punitive damages for the same deceptive practice are sought alternatively, with the required election and each underlying loss compensated once.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gregg Garner requests judgment against GRACE as follows:

A. Compensatory damages of $20,000,000 in the aggregate for Garner's personal economic, reputational, emotional, and consequential injuries proximately caused or aggravated by GRACE, including impaired earning capacity and treatment expenses;

B. Treble damages on qualifying actual loss under Tenn. Code Ann. § 47-18-109(a)(3)–(4);

C. Punitive damages under Tenn. Code Ann. § 29-39-104(a) and (g) for GRACE's malicious, intentional, or reckless tortious conduct, alternatively to any incompatible statutory enhancement;

D. Reasonable attorney fees and costs under Tenn. Code Ann. § 47-18-109(e)(1), taxable costs, and lawful prejudgment and postjudgment interest; and

E. Such other relief as the Court finds just and proper.

**Plaintiff demands a trial by jury for all issues so triable.**

Respectfully Submitted,
COBB LAW GROUP

*/s/ Bryant Kroll*

BRYANT KROLL, BPR #033394
DAVID G. GOODMAN, BPR #031803
COBB LAW GROUP
131 Walton Ferry Road, Suite 11
Hendersonville, Tennessee 37075
Telephone: (615) 649-0049
bryant@cobblawtn.com
david@cobblawtn.com

*Attorneys for Plaintiff Gregg Garner*